UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PAUL DISANTO,

                Plaintiff,

v.                                           Case No.  5:04-cv-459-Oc-GRJ

JO ANNE B. BARNHART, Commissioner of
the Social Security Administration,

                Defendant.

_____/

## ORDER

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits, and Supplemental Security Income.  (Doc. 1.)  The Commissioner has answered (Doc. 15), and both parties have filed briefs outlining their respective positions.  (Docs. 20 & 23).  For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED.**

## I. PROCEDURAL HISTORY

      Plaintiff filed an application for disability insurance benefits and Supplemental Security Income on January 3, 2001 (R. 76 & 460) alleging the onset of his disability occurred in May 1997.  (R. 145.)  Plaintiff's application was denied initially (R. 60) and upon reconsideration.  (R. 57.)  Plaintiff requested a hearing before an Administrative Law Judge, which was held on January 15, 2003.  (R. 463.)  On March 3, 2003, following the hearing, Administrative Law Judge Chester G. Senf (the "ALJ") issued a decision unfavorable to Plaintiff.  (R. 14-25.)  Plaintiff's request for review of that

decision was denied by the Appeals Council on June 28, 2004 (R. 3.), rendering the

ALJ's decision the final decision of the Commissioner.  On August 19, 2004, Plaintiff

filed the instant appeal to this Court of the Commissioner's final decision.  (Doc. 1.)

## II. ISSUES PRESENTED

Plaintiff argues that the ALJ erred in four ways.  First, Plaintiff contends that the

ALJ did not evaluate his nonexertional impairments appropriately. According to Plaintiff,

the ALJ should have found his mental impairment to be severe and his subjective

complaints of pain credible.  Second, Plaintiff asserts that the ALJ should have taken

account of these nonexertional impairments in his RFC, and therefore, the testimony of

a vocational expert was necessary to determine whether the Plaintiff could perform

alternative work in the economy.  Finally, Plaintiff argues that the ALJ failed to give

appropriate weight to the opinion of Plaintiff's examining physician, Dr. Tindall.

In response, the Commissioner maintains that the ALJ's findings were supported

by substantial evidence.  The Commissioner asserts that  the ALJ made a proper

determination of the credibility of Plaintiff's complaints of pain and assessment of the

extent of Plaintiff's mental impairments, correctly used the grids to determine there was

other work available for Plaintiff, and properly considered Dr. Tindall's opinion.  (Doc.

23.)

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do

---

[1]See 42 U.S.C. § 405(g).

more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making

---

[2]Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3]Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4]Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5]Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6]42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12]  Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner

---

[7]42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8]20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9]20 C.F.R. § 404.1520(b).

[10]20 C.F.R. § 404.1520(c).

[11]20 C.F.R. § 404.1520(d).

[12]20 C.F.R. § 404.1520(e).

[13]20 C.F.R. § 404.1520(f).

[14]Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987).  See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such

---

[15]Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
   In practice, the burden temporarily shifts at step five to the Commissioner. The
   Commissioner must produce evidence that there is other work available in
   significant numbers in the national economy that the claimant has the capacity to
   perform.  In order to be considered disabled, the claimant must then prove that he is
   unable to perform the jobs that the Commissioner lists. The temporary shifting of the
   burden to the Commissioner was initiated by the courts, and is not specifically provided
   for in the statutes or regulations. (Internal citations omitted).

[16]Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17]Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18]Walker, 826 F.2d at 1003.

[19]Wolfe, 86 F.3d at 1077-78.

evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV.  SUMMARY OF THE RECORD EVIDENCE

### A.  General Background, Education, and Work Experience

Plaintiff, born on February 20, 1958, was forty-four (44) years old at the time of the ALJ's decision.  (R. 145.)  He completed high school through the eleventh grade,[21] but received some vocational training in pipe fitting while serving in the military.  (R. 146.)  In the fifteen years before bringing this claim, Plaintiff worked as a heavy equipment operator from 1992-1997 and a pipe fitter from 1982-1992.  (R. 122.)  As a heavy equipment operator, Plaintiff operated payloaders, drove tractor trailers, and hauled logs, brush, and mulch.  (R. 123.)  He also disposed of trash and large objects which he placed in the truck hopper.  (*Id.*) This job required him to spend most of the day sitting, though he spent about an equal number of hours each day engaged in activities which required him to walk, stand, climb, stoop, or crouch.  (*Id.*) The heaviest objects he lifted weighed over one hundred pounds, and he frequently lifted objects weighing fifty pounds or more.  (*Id.*)

As a pipe fitter, Plaintiff pipe-fitted natural gas trains and modules and tested various sizes of water tanks for leaks.  In this job, he spent the majority of the day either

---

[20]See id.

[21]There is some discrepancy in the record on the Plaintiff's level of education.  On his Disability Report (R. 141) and in his psychological exam by Dr. Brown in July of 2001 (R. 211), Plaintiff marked the box showing he had finished school through the twelfth grade.  During the hearing, Plaintiff testified that he had only completed school through the ninth grade.  (R. 466.)

walking or standing.  At times he had to climb, stoop, kneel, or crawl, but almost never

sat.  He carried pipes to the work site everyday and lifted pipes and objects weighing at

the most fifty pounds but frequently only twenty-five pounds.  (R. 124.)

**B.  Medical Evidence of Pain and Physical Impairment**

Plaintiff claims that he became unable to work on May 31, 1997 due to increased

chronic pain from a previous work-related injury which occurred in December 1993 (R.

211, 395) and from a subsequent laminectomy in 1993 and diskectomy in 1994 (R. 374)

to repair his herniated disks and relieve the pain**.**  (R. 146, 467, 173, 207, 377.)  On

June 29, 1994, Dr. Charles Finn ("Dr. Finn") reported to the Worker's Compensation

Office that Plaintiff had reached maximum medical improvement but would still have

seven to nine percent impairment depending on whether surgery was necessary.  Dr.

Finn also reported that the Plaintiff would have permanent restrictions on his bending

and lifting capabilities.  (R. 395.)

In September 1996, Plaintiff saw Dr. Robert Hamilton ("Dr. Hamilton").  Dr.

Hamilton noted disc degeneration at L4-L5 and L3-L4[22] with post surgical changes at

L3-L4.  Upon reviewing the MRI at that time, he did not find any recurrent or residual

disc herniation.  (R. 367.)

On May 27, 1997, Plaintiff was admitted to the emergency room with back pain

(R. 371) after twisting his back and falling on a pool deck.  (R. 374.)  On May 28,

Plaintiff saw Dr. Finn who gave Plaintiff a prescription for Vicodin to take with him on a

trip to Puerto Rico and a Medrol Dosepak.  Plaintiff remained on full time, full duty

---

[22]L4-L5 refers to the fourth and fifth lumbar vertebrae of the spine.  5-P Attorneys' Dictionary of Medicine Scope 1 (2004).  L3-L4 refers to the third and fourth lumbar vertebrae of the spine.

status.  (R. 392.)  On May 29, Plaintiff saw Dr. Finn, and told the doctor that the pain

was exacerbated when he moved from a sitting to standing position or slouches.

Plaintiff reported that he gets some relief from lying down, but the pain makes it difficult

for him to sleep.  During this appointment, Plaintiff rejected the idea of going into

therapy to deal with the emotional side effects of his pain.  (R. 374.)

Plaintiff visited Dr. Finn for continuing complaints of back and hip pain which

radiated down his left leg and caused numbness of his left foot.  (R. 388.)  Based on an

MRI, Dr. Finn found that there was no disc herniation at L3-L4, but did find small disc

herniation at L5-S1.[23]  (R. 372, 387.)  Dr. Finn also found small herniation at L4-L5 and

recommended epidural steroid injections.  (*Id.*)  On July 2, 1997, Plaintiff went to see Dr.

Finn about extreme leg pain and numbness of his foot.  (R. 384.)  At this time, Dr. Finn

put the Plaintiff on light duty with a twenty pound lifting restriction.  After seeing the

Plaintiff on July 5, 1997, Dr. Finn put the Plaintiff on temporary total disability.  (R. 383.)

However, after Plaintiff refused to undergo a myelogram in July, Dr. Finn stopped

treating the Plaintiff because he could not do anything else for him without further

testing.  In concluding that Plaintiff had a herniated disc, he recommended that the

Plaintiff be limited to light duty and be restricted to lifting nothing heavier than twenty

pounds and be limited in the use of his left lower extremity for repetitive movements.

(R. 382.)

In September of 1997, Plaintiff was examined by Dr. William R. Greenberg ("Dr.

Greenberg").   The Plaintiff complained of the same symptoms discussed above:  pain

---

[23]L5-S1 refers to the fifth lumbar and first sacral vertebrae of the spine.  Id.

in his back, hip and buttocks, which radiated into his left leg causing pain and numbness in his foot.  Dr. Greenberg noted that while Plaintiff's pain was sometimes exacerbated by sitting in one position, standing, or moving, at other times such activity relieved the pain.  (R. 399.)  Plaintiff told Dr. Greenberg that he had not been able to find "light duty" work which was the reason he was not working at the time.  (R. 400.)  Dr. Greenberg's clinical diagnosis was musculoskeletal pain involving the gluteal region.  He recommended Plaintiff follow a stretching routine and follow-up testing for nerve damage. Dr. Greenberg did not recommend additional surgery.  Based on his examination, Dr. Greenberg authorized the Plaintiff to return to light duty work with the same restrictions previously imposed.  (R. 401.)

Plaintiff went to see Dr. James L. West ("Dr. West") on March 11, 1999.  In describing Plaintiff's past treatment, Dr. West noted that Plaintiff's primary care physician was giving him Soma,[24] for pain, and Hydrocodone.  In addition, Plaintiff was taking three Ibuprofen tablets three times a day.

Dr. West's notes disclose that Plaintiff's pain worsened in humid weather, and the pain in Plaintiff's lower back made Plaintiff feel as if he was "being zapped with an electrical wire."  (R. 405.)  During the examination, Plaintiff told Dr. West he has trouble with his normal daily activities due to pain.  (*Id.*)  It took Plaintiff an hour "to loosen up" in the morning and any activity requiring bending or twisting caused significant pain. Plaintiff could not sit for more than thirty minutes at a time. However, he could walk through a supermarket and walk his dog a few times a day.  He was restricted to lifting

---

[24]"The brand name of medicinal tablets containing carisoprodol; they are used for treatment of bone and muscle pain."  5-S Attorneys' Dictionary of Medicine 4366 (2004).

only objects that weighed twenty pounds or less, but could usually lift a bag of groceries.  Coughing or sneezing also exacerbated Plaintiff's pain.  (R. 405, 407.)

During the physical examination, Dr. West found that Plaintiff's cervical spine had "a good range of motion without evidence of muscle spasm."  Plaintiff also had a good range of motion of the upper and lower extremities.  Dr. West found that the dorsal and lumbar spine revealed some fasciculation[25] on the left side and in the mid and upper lumbar region.  Plaintiff had limited motion of his lumbar spine on forward flexion and lateral bending, and  Dr. West found sensitivity on palpation of the posterior structures at the lower lumbar region, over the upper sacrum, and on the sciatic notch on the left side.  (R. 406.)  Plaintiff complained of pain on the left side on a cross leg test, but Plaintiff could walk on his toes and heels and had a positive straight leg raising sign of forty-five to fifty degrees on the right while lying down, fifty degrees on the left, seventy-five on the left and seventy on the right while sitting.  There was some hyposensitivity on the outer part of the left calf when tested but sensation was good otherwise.  (R. 407.)

In an X-ray of Plaintiff's lumbar spine, Dr. West found good bone structure without fracture or dislocation, but some narrowing of the L5-S1 and L4-L5 intervertebral space.  There was also some spur formation of the posterosuperior aspect of L-5.  (R. 407.)  In Residual Physical Functional Capacity Assessments made by agency physicians in July and December of 1999, the physicians made many of the same findings as Dr. West.  Based on this assessment, the agency physicians recommended

---

[25] Fasciculation is the "uncoordinated local contraction of . . . bundles of muscle fibers, usually visible through the skin.  2-F Attorneys' Dictionary of Medicine 784 (2004).

10

that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds, Plaintiff could stand and/or walk for a total of six hours in an eight-hour workday, could sit for about six hours in an eight hour work day and had unlimited push and/or pull capabilities.  (R. 410, 437.)   In July, the agency physician found Plaintiff capable of light work.  (R. 411.)

In March of 2000, Plaintiff was seen by Dr. Mark S. Bowden at Citrus Primary Care who continued Plaintiff's prescriptions for Norco[26] and Soma to control the pain. He found that while Plaintiff had some paravertebral muscle tenderness at L4-S1, he had a good range of motion and  was able to bend forward and bring his fingertips to within about eighteen inches of the floor.  (R. 315.)

On July 18, 2000, Plaintiff went to the Brooksville Veteran's Administration Clinic for treatment and was seen by Dr. Michael Schaen ("Dr. Schaen").  Plaintiff was running out of insurance and needed assistance with the costs of treatment and additional prescriptions for his medications.  (R. 277.)  While Plaintiff did not describe any motor weakness, Dr. Schaen noted his complaints of constant pain.  (*Id.*)  The doctor's notes reflect that Plaintiff told him his pain begins shortly after he gets up in the morning and can last intermittently for days.  He may get temporary relief from his medications (R. 279), but the pain reoccurs.

Upon physical examination, Dr. Schaen found Plaintiff had tenderness at L5-S1 and his forward flexion range was limited due to pain.  Plaintiff also had pain on the left lateral flexion, or bending to the left side, and left iliolumbar triangle area.   Dr. Schaen

---

[26]A drug used for pain relief, it contains hydrocodone bitartrate and acetaminophen.  4-N <u>Attorneys' Dictionary of Medicine</u> 3234 (2004).

found that while Plaintiff could walk on his heels and toes, he had tight hamstring muscles and atrophic back muscles.  He had pain in his back only on straight leg raising on left side.  Dr. Schaen noted that Plaintiff had a long history of low back pain and various treatments, including surgery, nerve blocks, physical therapy, and other types of pain management.  He diagnosed Plaintiff with failed back syndrome because of the lack of relief from any of the aforementioned treatments.  Dr. Schaen noted that the medications Plaintiff was taking might cause additional depression.

On August 17, 2000, Plaintiff was reexamined by Dr. Schaen.  Dr. Schaen's notes disclose that Plaintiff complained of constant low back pain aggravated by prolonged sitting and change in position.  (R. 275.)  In his plan of treatment, Dr. Schaen opined that it was not possible to completely cure Plaintiff of his back pain and referred Plaintiff to a pain clinic.  Dr. Schaen and Plaintiff discussed and decided on the use of various medications to treat Plaintiff's pain.  While the Plaintiff requested Vicodin and Dr. Schaen suggested Oxycontin, the Plaintiff resumed the use of hydrocodone, Tylenol, and salsalate.  (R. 275.)

In November, Plaintiff was treated at a pain clinic.  The examiner at the clinic, Ziaur Rehman, noted that Plaintiff was reluctant to commit to an inpatient pain program because of his home life and was focused on the use of narcotics for pain relief.[27]  A plan of structural activity and psychotherapy for pain management was recommended. (R. 271.)  On December 19, 2000, Dr. Schaen did a pain assessment with Plaintiff to

---

[27] At various points in the record, it was noted that Plaintiff stopped taking his medication, even the narcotics.  Sometimes he claimed the medication was not taking care of his pain, but at the other times the record gives no explanation of Plaintiff's noncompliance.  (R. 271, 272, 274, 240, 246.)  Plaintiff was told by his doctor to notify the doctor in between his check-ups if the medications were not working. (R. 278.)

identify the specific location and type of pain sensation.  At this visit, Plaintiff did not ask

for a change in his pain treatment regimen and Dr. Schaen noted that the prescription

medications Plaintiff was on at the time, along with the use of a TENS unit, seemed to

provide temporary partial or complete relief of Plaintiff's pain.  Plaintiff's pain was

exacerbated by humidity and prolonged periods of bending, kneeling, standing, and

lifting  (R. 250, 266, 270) as well as cold weather.  (R. 263.)  Plaintiff also requested and

received a handicap parking permit.  Plaintiff told Dr. Schaen that the pain adversely

affected his mobility, mood, physical activity, relationships with others, sexual

functioning, sleep, social activities, his temper and work.  (R. 270.)

On April 25, 2001, Plaintiff saw Dr. Schaen for a routine checkup.  Dr. Schaen

refused to increase Plaintiff's dose of pain medication when he learned that Plaintiff was

attempting to lift light weights, an activity that would exacerbate the pain.  (R. 246.)   On

June 15, 2001, Dr. Mark Jacobson found that Plaintiff had degenerative disc disease[28]

at L3-4, L4-5, and L5-S1 indicated by the narrowing of the intervertebral spaces.  He

also found Grade 1 anterolisthesis of L4 with respect to L3.  On June 21, 2001, Dr.

Bowden found that Plaintiff was not having any new symptoms and while the amount of

medication he took each day varied, the pain seemed to be under control. (R. 310-311.)


On July 9, 2001, Dr. Donald J. Tindall (Dr. Tindall) examined Plaintiff.  Upon

interview with the Plaintiff, physical examination, and review of Plaintiff's X-rays, Dr.

---

[28]Degenerative disc disease refers to the "gradual deterioration of the disc between vertebrae." Such degeneration makes "the disc more susceptible to herniation. . . which can cause local pain in the affected area."  William C. Shiel, Jr., MD, FACP, FACR, Degenerative Disc Diseases and Sciatica, MedicineNet.com, at http://www.medicinenet.com/degenerative_disc/article.htm (last visited September 8, 2005).

Tindall found that Plaintiff had some tenderness over the left iliolumbar notch and

muscle atrophy of the thigh and calf.  He also found that Plaintiff's range of motion of his

thoracolumbar[29] spine was limited to some degree.  His notes disclose that Plaintiff told

him he can sit comfortably for only ten to twenty minutes and stand for ninety minutes at

a time.  Dr. Tindall's notes also disclose that Plaintiff reported he can walk about two

blocks and then must stop to rest, he can lift eight to ten pounds, and drive for about an

hour.  While he does not do any house or yardwork, he can independently perform most

daily living activities.[30]  (R. 207.)  Dr. Tindall concluded that Plaintff could no longer

perform his past work as a pipe fitter and heavy equipment operator, but had the

functional capacity to perform sedentary worked which allowed him to alternate between

sitting and standing for "no more than four to six hours a day" with bending and twisting

on an occasional basis.  (R. 209.)

On August 15, 2001, the agency medical examiner Steven Downing completed a

Physical Residual Functional Capacity Assessment which mirrors many of Dr. Tindall's

findings.  Downing found that Plaintiff could lift ten pounds, stand and/or walk for at least

two hours in an eight hour day, and sit with normal breaks for about six hours in an eight

hour workday.  (R. 228.)  He noted that Plaintiff had limited push and/or pull abilities in

his lower extremity.  Downing believed that within the above restrictions, Plaintiff could

pursue sedentary work (R. 229) but due to a lack of agility should avoid all hazards that

---

[29]Thoracolumbar involves "the thoracic (chest) and lumbar (loin) parts of the spine, of the spinal cord, or of the autonomic nervous system."  5 Attorney's Dictionary of Medicine 712

[30]Other parts of the record are inconsistent with this. Plaintiff and his wife describe how Plaintiff must be helped when getting dressed or bathing (R. 159, 478).  Most of the activities that are difficult for Plaintiff involve bending over, for example, to pick up a dropped object or tie his shoes.  (R. 159, 167.)

could possibly lead to re-injury.  (R. 231.)  Downing also concluded that the symptoms

and their severity alleged by the Plaintiff are consistent with the objective data and the

kinds of symptoms seen by others with his condition.  (R. 232.)

On August 6, 2001, Plaintiff went to see Dr. Schaen about numbness in the L1

and L2 dermatomes[31] of the right lower extremity, stating that his symptoms started

after sneezing two days prior.  On or about August 12, 2001, Plaintiff went to the

emergency room with complaints of low back pain and numbness in the right leg.  The

x-rays taken in the emergency room showed mild degenerative disc disease at the L5-

S1 level.  (R. 237.)  At a follow up visit with Dr. Schaen a week later, Plaintiff told the

doctor that he was not "satisfied with his medical regimen" because he was not

completely relieved of his pain.  Dr. Schaen found that the back pain was mostly

associated with flexion and right lateral bending, but that Plaintiff's pain was "stationary"

and he was on the maximum amount of medication to control the type of pain of which

he complained.

## C.  Medical Evidence of Depression or Mental Impairment

In 1999, Plaintiff's friends and wife noted a significant change in his behavior due

to his constant pain in the Office of Disability Determinations questionnaires.  He no

longer took part in many social activities and he had difficulty getting along with others

or dealing with pressure and stressful situations.  (R. 160, 156.)  Plaintiff himself also

reported in a psychological questionnaire that he felt very depressed and no longer

---

[31] A dermatome is "[t]he area of skin supplied by the branches of one spinal nerve.  A spinal nerve is a nerve which takes off from the spinal cord and emerges from a small opening in the spine."  2-D Attorneys' Dictionary of Medicine 1691 (2004).

participated in many of the activities he previously enjoyed doing.  He also noted his increased irritability with others and difficulty handling stress.  (R. 167-169.)

On November 19, 1999, Gerald J. Hodan, Ph.D., performed a consultative psychological evaluation.  He noted Plaintiff's complaints of sleeplessness, variable appetite, lack of energy and motivation, and feelings of guilt because his wife has had to do more now that his pain prevents him from being as active.  Hodan, however, also noted that Plaintiff did not exhibit any signs of anxiety or psychotic symptoms, although he did exhibit symptoms of low self-esteem.  (R. 418.)  His cognitive evaluation of Plaintiff showed him to be "alert" and "clear thinking" and to function within the "average range of intelligence."  (R. 419.)  With respect to his "psychological work capabilities," Hodan did not find that  Plaintiff had "severe impairments in attention, concentration or memory functions needed to understand, remember and follow through on instructions given to him in a job setting."  Hodan opined that while Plaintiff's depressed mood "will slow him down some" and hurt his ability to deal with stress, he should be able to get along fairly well with others unless he is in considerable pain.  Plaintiff could be relied upon to show up on time and dress appropriately for work.  (R. 419.)  He was found to function at a Global Assessment of Functioning ("GAF")) level of 65.[32]  (R. 420.)

On November 20, 1999, Michael M. Zelenka, Ph.D., completed a Psychiatric Review Technique form for the agency.  In it, he also found that Plaintiff had an

---

[32]    The Global Assessment of Functioning Scale assessed the psychological, social, and occupational functioning of someone with a mental health illness.  Plaintiff's GAF of 65 corresponds to an assessment that he exhibited "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) . . . but generally function[s] pretty well, [and] has some meaningful interpersonal relationships.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) [hereinafter DSM-IV] .

Affective Disorder.  (R. 421.)  In his evaluation, Dr. Zelenka noted Plaintiff's disturbance of mood and loss of interest in activity, appetite and sleep disturbances, pyschomotor agitation, feelings of guilt, and difficulty concentrating.  (R. 425, 429.) In the Mental Residual Functional Capacity Assessment, Zelenka found that Plaintiff's mental impairment did not significantly limit his understanding and memory, concentration and persistence, social interaction, or adaptation. He noted moderate limitations in Plaintiff's ability to complete a normal workday without interruptions from psychological symptoms or perform at a consistent pace without needing to take too many breaks, and moderate limitations in Plaintiff's ability to maintain attention and concentration over extended periods and work in coordination or proximity to others without being distracted by them. (R. 431, 433.)

In 2000, on a questionnaire Plaintiff completed during his medical examination with Dr. Schaen, Plaintiff did not disclose any feelings of depression.  (R. 253.)   In 2001, Hugh Brown, Ph.D., performed a psychological evaluation of Plaintiff.  In it, he found that Plaintiff most likely suffered from "agitated depression secondary to status chronic pain."  He noted that Plaintiff drove himself to the appointment and while his mood and manner were "restricted" and "dysphoric," nothing else about the Plaintiff seemed indicative of any deeper psychological trauma.  Brown diagnosed him with Adjustment Disorder with Depressed Mood and Pain Disorder Associated with Low Back Injury.[33]  Although Brown gave Plaintiff a poor prognosis, he noted that Plaintiff

---

[33] According to the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, Adjustment Disorder is characterized by emotional or behavior reactions to an identifiable stressor that exceed the expected normal reaction or cause "significant impairment in social or occupational functioning."  These changes or symptoms must develop within three months after exposure to the stressor.  <u>DSM-IV</u> at 679.  Depressed

(continued…)

had no trouble following directions, answering questions, paying attention, and appeared of average intelligence.  Plaintiff did not exhibit any difficulty in his oral language skills or act inappropriately in the social context of the examination.  (R. 211.) Plaintiff told Brown that he acts independently with respect to most of his daily life activities and continues to drive.

Brown recommended that Plaintiff receive adjustment counseling and participate in a pain management clinic, but did not recommend that the Plaintiff take anti-depressant medication.  Brown did surmise that plaintiff's mood and pain would make it difficult for him to understand, carry out, and remember instructions as well as respond appropriately to coworkers and work pressures.[34]  (R. 212.)  In two separate psychological assessments performed by the agency on August 10, 2001 (R. 213) and October 11, 2001 (R. 331), both psychologists found that Plaintiff's mental impairment was not severe but did classify it as an affective and/or somatoform[35] disorder.

---

[33](…continued)
mood is linked to Adjustment Disorder when "the predominant manifestations are symptoms such as depressed mood, tearfulness, or feelings of hopelessness."
    On the other hand, Pain Disorder Associated with Low Back Injury is not a mental disorder because it is classified as Pain Disorder Associated With a General Medical Condition. Here, the pain is caused by the medical condition (low back injury) and not other psychological factors.  DSM-IV at 499.  The pain, however, may cause "distress or impair[] social, occupational, or other areas of functioning."  DSM-IV 498.

[34]As the ALJ found, however, Dr. Brown's ultimate conclusion of "functional activity" seems to be inconsistent with the clinical examination and notes that preceded it.  (R. 18.)

[35]"Somatoform" is another way to specify a Pain Disorder.  DSM-IV at 485.

18

# IV.  DISCUSSION

## A.  The ALJ's Analysis of Plaintiff's Nonexertional Impairments

### 1.  Plaintiff's depression as a mental impairment

Plaintiff contends that the ALJ erred because he did not find Plaintiff's mental
impairment severe.  While in step two of his analysis for determining disability benefits
the ALJ did not explicitly find that the Plaintiff's depression was "severe," the ALJ did, in
fact, consider Plaintiff's depression as a mental impairment in step four of his analysis
and weigh it appropriately in making his RFC determination. There is substantial
evidence in the record to support the ALJ's conclusion that although Plaintiff's
depression was an impairment, it was not so severe as to impair Plaintiff's basic work
activities.[36]

Under Social Security Ruling 85-15[37] a nonexertional impairment is defined as
"one which is medically determinable and causes a nonexertional limitation of function. .
. .[It] may or may not affect a person's capacity to carry out the primary strength
requirements of jobs, and [it] may or may not significantly narrow the range of work a
person can do."  The Eleventh Circuit in Brady v. Heckler[38] established the standard by
which an ALJ must measure the severity of an impairment at step two.  An impairment

---

[36] Phillips v. Barnhart, 357 F.3d 1232, 1243 (11th Cir. 2004) ("[T]he  ALJ need only determine
whether Phillips's nonexertional impairments significantly limit her basic work skills" which "prohibit a
claimant from performing a wide range of work at a given level.")(internal quotations omitted); see also
Foote, 67 F.3d at 1559.

[37] Social Security Administration, Program Policy Statement, Titles II and XVI: Capability to Do
Other Work--The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional
Impairments, SSR 85-14, 1985 WL 56857, at *2 (1985).

[38]742 F.2d 914 (11th Cir. 1984).

must be found severe at step two for the court to continue with the disability evaluation. In Brady, the court held that an "impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."[39]  The Eleventh Circuit clarified this inquiry in McDaniel v. Bowen by stating that at step two, the ALJ should determine if the claimant's impairment is severe or not severe, but that the burden on the claimant is mild.  Any impairment is considered severe if it has more than "slight" or "minimal" effect.[40]  "If a claimant succeeds at step two, the ALJ must go on to step three and then, if necessary, to steps four and five." [41]

In his findings, the ALJ found that "the claimant has an impairment or a combination of impairments considered 'severe.' "  (R. 24.)  The ALJ then considered the effects of these nonexertional impairments, namely mental depression and pain, at step four in making his determination of the Plaintiff's residual functional capacity.  (R. 21, 22.)  The ALJ would only have had to consider the nonexertional mental impairment at step four under McDaniel if he found it to be "severe" at step two, although no explicit finding of severity was made.  This renders Plaintiff's argument on this point moot, since the ALJ did, in fact, find Plaintiff's mental impairment "severe" enough at step two to

---

[39]McDaniel v. Bowen, 800 F.2d 1026, 1031(quoting Brady, 724 F.2d at 920).

[40]Id.

[41]Id.  at 1032.

include it his RFC analysis.  The ALJ, however, found that Plaintiff's mental impairment was not severe enough to impact the RFC at step four.[42]

In determining that Plaintiff's mental impairment was not severe, the ALJ noted that Plaintiff is not under any current mental health treatment for depression. (R. 22.)  In addition, Dr. Hodan found that the Plaintiff had no impairment in attention, concentration or memory, and that he could get along with others and deal with stress.  On the GAF scale, Dr. Hodan opined that Plaintiff scored a sixty-five, thus suggesting only mild symptoms of depression.  (R. 419-420.)  Dr. Brown made similar findings, noting that the Plaintiff had no trouble following directions, paying attention, communicating or interacting with others, and continued to act independently when performing most daily living activities.  While Dr. Brown recommended that the Plaintiff seek some counseling, he did not find Plaintiff's condition severe enough to require the use of antidepressants or raise insurmountable difficulties to resuming work.  (R. 211-212.)  Based on these and other psychological evaluations of the Plaintiff in the record, there was substantial evidence to support the ALJ's finding that Plaintiff had a "non-severe mental impairment" to the extent that it does not significantly interfere with basic work activities. (R. 21.)

---

[42]See Ramos v. Barnhart, 119 Fed. Appx. 295, 296 (1st Cir. 2005) (holding that substantial evidence supported the finding that the claimant's severe depression "did not significantly affect her ability to perform the full range of jobs at the relevant exertional level"); see also Ford v. Chater, No. 95-2188, 1996 U.S. App. LEXIS 11451 (10th Cir. May 17, 1996) (holding that Plaintiff's adjustment order with depressed mood did not impact her ability to do light, unskilled work and so the ALJ did not err in using the grids without calling a vocational expert to testify).

### 2.  The Plaintiff's subjective complaints of pain

The ALJ must "consider a claimant's subjective testimony of pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of such a severity that it reasonably can be expected to give rise to the alleged pain.[43]  The ALJ may reject the plaintiff's subjective pain testimony, but the decision must be supported by substantial evidence.[44] Moreover, if the ALJ rejects a claimant's testimony of pain on credibility grounds, the ALJ must discredit it explicitly, and articulate the reasons for doing so.[45]

In this case, the ALJ examined all of the medical evidence and found that the Plaintiff's complaints of pain were "out of proportion and inconsistent" with the record evidence and, therefore, not fully credible.  While the ALJ noted that the Plaintiff lives a sedentary lifestyle, both the Plaintiff and many of the consulting and treating doctors in the record reported that the Plaintiff continues to perform most of his daily activities independently.  Plaintiff testified that he still drives (R. 470), could lift items weighing eight to ten pounds (R. 474), helps his kids with their homework (R. 477), and that the medication he takes provides temporary relief with minimal side effects.[46]  Plaintiff even testified that he has attempted to find work he could do within his limitations.  (R. 479,

---

[43]Foote, 67 F.3d at 1560.

[44]Id.

[45]Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

[46]The ALJ noted that no side effects of Plaintiff's medications are indicated in the progress notes in the record.  (R. 22.)

399.)  While the amount of pain Plaintiff experiences seems to vary from day to day (R.

310-11), his overall physical impairments have not changed much since his surgery in

1997.  Based on the foregoing, substantial evidence in the record supports the ALJ's

finding that while the pain has placed limitations on what the Plaintiff can do, the

evidence is inconsistent with Plaintiff's claims that the pain has incapacitated him.

**B.      The ALJ's Reliance On The Grids**

In conjunction with the ALJ's analysis of Plaintiff's mental impairment and

subjective complaints of pain, Plaintiff also asserts that the ALJ erred in relying on the

Grids to determine whether the Plaintiff could perform alternative work in the national

economy.  In the Eleventh Circuit, "the grids may be used in lieu of vocational testimony

on specific jobs if none of the claimant's nonexertional impairments are so severe as to

prevent a full range of employment at the designated level."[47]  A nonexertional

impairment is one that affects the claimant's ability to meet the demands of a job other

than the strength demands.[48]  Both Dr. Tindall (R. 209) and the ALJ found that the

Plaintiff could perform sedentary work.[49]  (R. 25.)  Plaintiff's previous doctors, Dr. Finn

and Dr. Greenberg, had recommended that the Plaintiff could perform light duty work.

(R. 382, 400.) Based on the record evidence discussed above, there was substantial

---

[47]Wolfe, 86 F.3d at 1077-78; see also Phillips, 357 F. 3 1232 at 1244; Passopulos v. Sullivan, 976 F.2d 642, 648 (11th Cir. 1992)

[48]20 C.F.R. §§ 404.1569a(a) & (c).

[49] Sedentary work is defined as work which "involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involve sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R § 404.1567.

evidence supporting the ALJ's finding that the Plaintiff's nonexertional impairments--depression and pain-- were not so severe as to impact his ability to perform the basic work activities at a level of sedentary work.  Accordingly, it was not error for the ALJ to rely on the Grids instead of utilizing a vocational expert.

## C. The Weight Given To The Testimony of Plaintiff's Examining Physician

Plaintiff argues that the ALJ did not give substantial weight to the testimony of Plaintiff's examining physician, Dr. Tindall.  It is well established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[50]  However, Dr. Tindall was an "examining" or consultative physician, not a treating physician, who treated the Plaintiff on a continuing basis.  Dr. Tindall conducted an exam, and made an RFC recommendation, after reviewing medical records, but he did not offer any treatment to the Plaintiff for his back pain.

Accordingly, while Dr. Tindall's opinion is entitled to some weight because he examined the Plaintiff, his opinion is not entitled to greater weight than the Plaintiff's treating physicians.[51]  Where a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and

---

[50]Crawford v. Comm'r of Soc. Sec., 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."). See also Edwards, 937 F.2d at 583-584; Sabo v. Comm'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[51]Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[52]

In this case, the ALJ weighed the opinions of Plaintiff's treating physicians, Drs. Finn, Greenberg, and West, as well as that of Dr. Schaen at the Veterans' Administration Brooksville Outpatient Clinic and Dr. Bowden at Citrus Primary Care. These opinions spanned a period of time from 1997-2001. A review of these medical records - consisting of physical examinations, MRI reports and clinical notes - disclose that Plaintiff's symptoms did not vary much over these four years.  Various medications were prescribed, and while some worked better than others, the Plaintiff was able to get at least temporary relief from his pain.  Even though at times Plaintiff seemed to have some mild tenderness in the lower lumbar region and some muscle atrophy, he retained a good range of motion, exhibited little to no motor weakness and had good reflexes. Notably, both Drs. Finn and Greenberg recommended that Plaintiff could return to light duty work. The ALJ appropriately gave weight to these opinions of the treating doctors, as well as the opinion of Dr. Tindall, and the evaluations compiled by the agency physicians, to support his RFC finding that the Plaintiff could perform sedentary work. Indeed, the ALJ's finding that Plaintiff was limited to sedentary work is  consistent with Dr. Tindall's recommendation.

Specifically, Dr. Tindall recommended that Plaintiff had "the functional capacity to alternately sit and stand ad lib[53] for no more than 4-6 hours daily doing sedentary type work with bending and twisting on an occasional basis."  The ALJ found that the

---

[52]20 C.F.R. § 404.1527(d)(2).

[53]*Ad lib* means to be done "in accordance with one's wishes" or "without restraint or limitation." Merriam Webster's Collegiate Dictionary 15 (10th ed. 2001).

Plaintiff's RFC included the ability to stand and walk for two hours in an eight hour workday which is not inconsistent with Tindall's finding, and the ability to sit for six hours in an eight hour workday.  The ALJ interpreted Dr. Tindall's opinion regaridng Plaintiff's restrictions to mean that the Plaintiff could sit for a maximum of six hours a day with the ability to get up and stand "ad lib" or as needed during the remaining portion of the work day.[54] There is nothing in Dr. Tindall's report that suggests, as Plaintiff argues, that Plaintiff was limited only to a six hour work day. This interpretation by the ALJ is also consistent with the clinical reports of Plaintiff's other treating physicians many of whom opined that with medication, Plaintiff's pain seemed to be under control. (R. 279, 266, 311, 310.)   Accordingly, the RFC finding by the ALJ is not inconsistent with the opinion of Dr. Tindall and thus Plaintiff's argument that the ALJ failed to give proper weight to Dr. Tindall's opinion in determining the Plaintiff's RFC is without merit.

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED** and the Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 27, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
Counsel of Record

---

[54]  While there is much controversy over whether part time work satisfies the step one inquiry of substantial gainful activity, it appears that in a step five inquiry on alternative work in the national economy, the Plaintiff must have the "residual functional capacity to work on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule."  Kelley v. Apfel, 185 F.3d 1211, 1214-15 (11th Cir. 1999) (quoting Social Security Administration, Social Security Ruling, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184, at *1 (1996)) (internal quotations omitted).